UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| RHODLYN THOMAS, individually, and | * | |
| on behalf of her minor child, BW, | * | |
| | * | |
| Plaintiff, | * | |
| | * | |
| v. | * | |
| | * | Civil Action No. 12-cv-30224-MGM |
| SPRINGFIELD SCHOOL COMMITTEE, | * | |
| THE CITY OF SPRINGFIELD, ALAN | * | |
| INGRAM, MARY ANNE MORRIS, and | * | |
| JONATHAN SWAN | * | |
| | * | |
| Defendants. | * | |

MEMORANDUM AND ORDER ON DEFENDANT'S MOTION FOR
SUMMARY JUDGMENT AS TO ALL COUNTS OF THE PLAINTIFF'S COMPLAINT
(Dkt. No. 36)

November 19, 2014

MASTROIANNI, U.S.D.J.

This action is brought by Plaintiff, Rhodlyn Thomas, individually and on behalf of her minor

child, "BW," pursuant to 42 U.S.C. § 1983, Title IX of the Education Amendments of 1972, 86 Stat.

373, 20 U.S.C. § 1681(a) (2006) ("Title IX"), Title II of the Americans with Disabilities Act, see 42

U.S.C. § 12131-12165 (2006) ("ADA"), and certain provisions of Massachusetts law.[1]  Plaintiff has filed this suit against Defendants (1) Jonathan Swan ("Swan"), the principal of the school attended by BW at the time of the incidents, (2) Alan Ingram ("Ingram"), Superintendent of the Springfield Public Schools, (3) Mary Anne Morris ("Morris"), the Director of Pupil Services for the Springfield Public Schools, (4) the Springfield School Committee, and (5) the Springfield Public Schools (together with the Springfield School Committee, the "Springfield Defendants").  She asserts Defendants' mishandling of peer-to-peer harassment deprived BW of educational opportunities and her civil rights.

Defendants have moved for summary judgment on all of Plaintiff's federal claims. Plaintiff opposes Defendants' motion for summary judgment. As the court is required to view the facts in the light most favorable to the Plaintiff, the court's recitation of the facts includes all relevant facts favorable to Plaintiff for which there is support in the record.

I. BACKGROUND

2008-2009 School Year

During the 2008-2009 school year, BW was a sixth grader at Duggan Middle School ("Duggan") in Springfield. (Dkt. No. 37-1, BW Depo. at 19.) She received special education services to address a specific learning disability. (Dkt. No. 42-3, Morris Depo. at 46.) BW also has some social skills deficits and difficulties managing anxiety. (Id.) As a sixth grader, BW often acted younger than her age and did not show an interest in boys. (Dkt. No. 42-4, Berrios Depo. at 18-19.) Pursuant to her IEP, BW was in a substantially separate classroom during sixth grade, which meant that she spent most of her day in a single classroom with a teacher, Linda Cortelli ("Cortelli"), and one or more aides, including Ronnie Berrios ("Berrios"). (Dkt. No. 37-3, 2008-2009 IEP; Dkt. 42-4,

---

[1] As the court has only been asked to address Plaintiff's federal claims, the court does not discuss Plaintiff's state law claims at this time.

2

Berrios Depo. at 13.) When BW did leave her classroom, she stayed with the same group of fewer than ten students, including one student referred to throughout this litigation, and hereinafter, as RJ. (Dkt. No. 37-1, BW Depo. at 12-14.)

On May 11, 2009, B.W., then age twelve, and the rest of her class were at gym class, together with students from other classes. (Dkt. No. 37-1, BW Depo. at 7; Dkt. No. 42-4, Berrios Depo. at 21-24; Dkt. No. 37-3, Incident Report dated 5/15/2009.) Their regular aide, Berrios, accompanied the students. (Dkt. No. 42-4, Berrios Depo. at 21-24.) During gym class, BW and another female student were sitting on the bleachers. RJ sat near them and Berrios observed RJ touch BW's breast and crotch. (Id.) BW was surprised by the touching and had not consented to it. (Dkt. No. 37-1, BW Depo. at 29.) After the touching occurred, Berrios separated the students. (Dkt. No. 42-4, Berrios Depo. at 21-24.) Cortelli called Plaintiff to inform her of the incident. (Dkt. 37-2, Thomas Depo. at 25.) Plaintiff filed a police report and later met with Cortelli. (Id. at 27-31.) At her meeting with Cortelli, Plaintiff requested that RJ be placed in a different classroom. (Id. at 30.) Following the incident, RJ was suspended and when he returned to school he was placed in different class for the remainder of the 2008-2009 school year. (Dkt. 37-4, RJ Depo. at 11; Dkt. 37-1, BW Depo. at 34.)

2009-2010 School Year

When BW returned from summer break for her seventh grade year at Duggan, she was again placed in self-contained classroom with RJ, though with a new teacher, Dharam Khalsa ("Khalsa"), and new aides. (Dkt. No. 37-1, BW Depo. 37-1 at 38-41.) Plaintiff was not informed that BW had been placed in the same classroom with RJ. (Dkt. No. 37-3, Thomas Depo. at 37-38.) It was not the policy of the Springfield Defendants to always inform classroom teachers of previous inappropriate incidents between students. (Dkt. No. 42-3, Morris Depo. at 33-35.) The court infers from the record that Khalsa was not informed about the May 2009 incident or instructed to pay particular attention to interactions between BW and RJ.

On January 15, 2010, the Friday before the Martin Luther King, Jr. holiday, RJ asked BW, now aged thirteen, to be his girlfriend. (Dkt. No. 37-1, BW Depo. at 50.) She said she would have to think about it. (Id.) The following Tuesday, when they were back in school, BW told RJ she had not thought about being his girlfriend. (Id.) The two did not talk again until their last class of the day, gym. (Id. at 52.) The gym was in the basement of Duggan Middle School, while their self-contained classroom was on the second floor. (Dkt. No. 42-2, Letter from Swan to Khalsa dated January 28, 2010.) Duggan policy required an adult escort students from one location to another; students were not to be left unattended in hallways. (Id.) Khalsa did not accompany her class to the gym on January 19, 2010 and the court infers that she regularly failed to escort her students to the gym. (Id.)

After arriving at the gym, BW waited in the hallway for other students to arrive from other classes. (Dkt. No. 37-1, BW Depo. at 55-56.) While she was waiting, RJ approached her and directed her to walk back upstairs with him. (Id. at 55.) BW asked him why and then started to walk towards the gym. (Id.) RJ then threatened that he would "pull on [her] arm" if she did not walk with him. (Id.) BW walked with RJ through the school for approximately five minutes until they arrived at the school auditorium. (Id.) During that walk they did not see any school personnel. (Id.)

The auditorium was dark. (Id. at 57.) BW and RJ walked behind the piano. (Id.) RJ repeatedly told BW to pull her pants down. (Id.) BW repeatedly said no. (Id.) RJ pulled down his own pants and pulled down BW's pants and underpants. (Id.) He laid BW down and without her consent got on top of her and penetrated her vagina with his penis.[2] (Id. at 58-59.) After approximately two to three minutes, RJ got up, pulled up his pants and left the auditorium. (Id. at 59-60.) BW left the auditorium about a minute later. (Id. at 60.) BW collected her belongings from the locker room and got on her bus to go home. (Id. at 61.) BW did not report the incident to anyone that day. (Id.)

---

[2] Plaintiff asserts, as a factual matter, that BW did not consent to sexual contact with RJ. In addition, the court notes that BW was too young to give legally valid consent to such contact. See discussion infra p. 8.

One or more days later,[3] BW's gym class took place right before lunch. (Id.) During gym class, BW was sitting on the bleachers and RJ walked towards her. (Id.) He told her to go with him or he would pull her arm. (Id. at 62.) BW left with RJ and they went to the auditorium where events occurred in the same manner as during the previous incident. (Id. at 64.) Afterwards, BW returned to the gym and then went with her class to lunch. (Id. at 66-67.) Again, she did not report the incident to anyone that day. (Id. at 67.)

The following day, or possibly several days later, while BW was in the cafeteria for lunch, another student said to her, "I heard you and RJ did it in the bathroom." (Id. 68-70.) At least one other student also asked BW if she and RJ "did it" in the bathroom. (Id. at 69.) BW said no, threw away her lunch and ran, crying, to the teacher's lounge, where she reported the incidents to a teacher. (Id.) That teacher sent BW to talk with the assistant teacher assigned to BW's self-contained classroom. (Id.) BW repeated her story to her teacher and then repeated it two more times for two other teachers. (Id. at 71.) A group of three teachers then took BW to the Vice Principal's office. (Id. at 73.) While in the Vice Principal's office, BW spoke with two vice principals and wrote a statement regarding the incident. (Id. at 73, 77.)

Plaintiff was not informed of the incident until two days later. (Dkt. No. 37-2, Thomas Depo. at 41.) RJ and BW both remained in the same self-contained classroom during those two days. (Dkt. No. 37-1, BW Depo. at 78-79.) Upon learning of the incidents, Plaintiff began keeping BW home from school. (Id. at 83.) She also tried to schedule a meeting with BW's IEP team to review the events and develop a safety plan for BW.[4] (Dkt. No. 37-2, Thomas Depo. at 70.) At a later date, Plaintiff did allow BW to return to Duggan, though BW attended just a single day.[5] (Dkt.

---

[3] The court notes there is a discrepancy with respect to timing of the second incident. At her deposition, BW indicated that the incidents happened on consecutive days. Dkt. No. 37-1, BW Depo. at 61. In her more contemporaneous written statement, BW indicated that the first incident occurred on a Tuesday and the second occurred on a Thursday. Dkt. No. 42-10, Written Statement of BW dated 1/25/2010.

[4] The record before the court is unclear as to the timing of Plaintiff's request for a meeting of the IEP team.

[5] The exact date when BW returned to school and saw RJ in the hallway is not in the materials before the court.

No. 37-1, BW Depo. at 83.) Although BW and RJ were assigned to different classrooms the day BW returned to Duggan, they did have limited contact in the hallway and that contact was upsetting to BW. (Id.)

In early March, BW's IEP team met for BW's annual IEP meeting. (Dkt. No. 37-2, Thomas Depo. at 70.) That meeting was the first meeting of BW's IEP team since the January incident. (Id.) During the meeting, the participants, including Plaintiff, discussed implementing a safety plan for BW. (Id. at 71.) Plaintiff was bothered by some of the information she received at the meeting and worried that BW was not properly supervised at Duggan. (Id. at 71-72.) BW did not return to Duggan for the rest of the year. (Id. at 14.) For some period of time following the incident she received no educational services; eventually she began receiving home tutoring. (Id. at 73-74.) BW attended a different middle school the following year. (Id. at 14.)

## II. Legal Standard

"Summary judgment is appropriate 'if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" Bellone v. Southwick-Tolland Regional School Dist., 748 F.3d 418, 422 (1st Cir. 2014) (quoting Fed. R. Civ. P. 56(a)). An issue is "genuine" when the evidence is such that a reasonable fact-finder could resolve the point in favor of the non-moving party, and a fact is "material" when it might affect the outcome of the suit under the applicable law. Morris v. Gov't Dev. Bank, 27 F.3d 746, 748 (1st Cir. 1994). At summary judgment, the court looks "to all of the record materials on file, including the pleadings, depositions, and affidavits." Hicks v. Johnson, 755 F.3d 738, 743 (1st Cir. 2014). The court must then view these facts and all reasonable inferences that might be drawn from them in the light most favorable to the non-moving party. Pac. Ins. Co., Ltd. V. Eaton Vance Mgmt., 496 F.3d 584, 588 (1st Cir. 2004). "To succeed [in a motion for summary judgment], the moving party must

show that there is an absence of evidence to support the nonmoving party's position." <u>Rogers v. Fair</u>, 902 F.2d 140, 143 (1st Cir. 1990); see also <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 325 (1986).

III.   ANALYSIS

A.   <u>Title IX Claim</u>

Plaintiff claims the Springfield Defendants and individual defendants, Ingram, Morris, and Swan, violated Title IX by acting with deliberate indifference to RJ's 2009 assault of BW, of which they had actual knowledge, and that their failure to take steps to supervise BW adequately exposed her to further injuries. As a preliminary matter, the Supreme Court has recognized two enforcement mechanisms under Title IX, (1) an administrative procedure that can result in the withdrawal of federal funding and (2) an "implied private right of action." <u>Fitzgerald v. Barnstable School Comm.</u>, 555 U.S. 246, 255 (2009) (quoting <u>Cannon v. University of Chicago</u>, 441 U.S. 677, 717 (1979)). Enforcement, pursuant to either mechanism, is only available as against a recipient of federal education funding. <u>See id.</u>; <u>Porto v. Town of Tewksbury</u>, 488 F.3d 67, 69 (1st Cir. 2007). Defendants' motion is, therefore, granted as to the Title IX claims asserted against the individual defendants, Ingram, Morris, and Swan. The Springfield Defendants have not disputed that they receive federal education funding and are therefore subject to suit pursuant to the implied private right recognized by the Supreme Court in <u>Cannon</u>.

As recipients of federal educational funding, the Springfield Defendants may be directly liable for damages if they, through the actions of school district officials, were "deliberately indifferent to known acts of student-on-student sexual harassment and the harasser [was] under the [school district's] disciplinary authority." <u>Davis v. Monroe County Bd. of Educ.</u>, 526 U.S. 629, 647 (1999). "A funding recipient is deliberately indifferent to student-on-student harassment when 'the recipient's response to the harassment or lack thereof is clearly unreasonable in light of the known

circumstances.'" Porto v. Town of Tewksbury, 488 F.3d 67, 72 (1st Cir. 2007) (quoting Davis, 526 U.S. at 648). In order to establish liability in connection with student-on-student harassment, a plaintiff:

> must show (1) that he or she was subject to "severe, pervasive, and objectively offensive" sexual harassment by a school peer, and (2) that the harassment caused the plaintiff to be deprived of educational opportunities or benefits . . . (3) [the funding recipient] knew of the harassment, (4) in its programs or activities and (5) it was deliberately indifferent to the harassment such that its response (or lack thereof) is clearly unreasonable in light of the known circumstances.

Id. at 72-73.

As the moving party, the Springfield Defendants have the burden of showing an absence of record evidence supporting one or more of these elements. The court addresses the record evidence relating to each of these elements.

First, the Defendants must show an absence of facts from which a jury could find that BW was subject to "severe, pervasive, and objectively offensive" sexual harassment by a school peer. With respect to this element, the parties agree that in May 2009, RJ, a classmate and school peer of BW, touched BW in a sexual manner during their gym class. This touching was witnessed by a teacher and reported to at least one school administrator. At this stage of the proceeding, the court takes as true Plaintiff's assertion that BW did not consent in any way to this touching and notes that under Massachusetts law, BW, who was twelve at the time, was too young to give legal consent. See Comm. V. Bernardo B., 453 Mass. 158, 172 (2009) (stating that four children, ages 11 to 14 were all "too young to consent legally to the sexual activity in which they engaged"). Approximately eight months after the May 2009 incident, RJ had sexual intercourse with BW on at least two occasions, during school. For purposes of this motion, the court takes as true Plaintiff's assertion this sexual contact was against BW's will. Additionally, the court notes that regardless of the truth of Plaintiff's factual assertions, BW was too young to legally consent to sexual activity with RJ.

8

The three events were serious in nature and the alleged conduct provides sufficient basis for a jury to conclude that RJ, a school peer of BW, subjected her to harassment that was severe, pervasive, and objectively offensive. See Davis, 526 U.S. at 631 (suggesting that even a "single instance of severe on-on-one peer harassment" could be actionable under Title IX).

As to the second element, that the harassment deprived BW of educational opportunities and benefits; Plaintiff was concerned BW would not be safe if she returned to school. Following the January 2010 incidents, Plaintiff kept BW home for a period of time. On the one day BW returned to school, she saw RJ in the hallway. That incident deepened Plaintiff's concern for BW's safety at school. Plaintiff remained concerned for BW's safety after the IEP meeting in early March and continued to keep BW home for the remainder of the school year. A reasonable jury could infer from this evidence that BW stopped attending school because of the serious nature of RJ's harassment and continuing risks to her safety.

There is ample evidence in the record from which a jury could conclude that the third and fourth elements are established. As to the third element, knowledge of the harassment, the record is clear that the Springfield Defendants knew about the May 2009 incident at the time it happened and learned of the January 2010 incidents shortly after they occurred. All the incidents occurred on school property and during school hours, thereby establishing the fourth element. See id. at 652-53.

Finally, the court comes to the fifth element of a Title IX claim—deliberate indifference. The court considers whether the Springfield Defendants' response to the May 2009 incident was clearly unreasonable in light of the known circumstances. Both parties urge this court to evaluate the circumstances and conduct consistent with the guidance provided by the First Circuit in Porto v. Town of Tewksbury, 488 F.3d 67 (1st Cir. 2007).

In Porto, the First Circuit ruled that a school district's handling of inappropriate sexual contact between adolescent special education students, as a matter of law, did not rise to the level of

"deliberate indifference." Id. at 76. The parents of one boy, SC, had sued the school district in which their son was a special education student after he and another boy, RC were discovered in a bathroom having engaged in sexual intercourse. Id. at 71. The two boys had been in the same special education class from first through fifth grade and SC's parents had previously reported various sexually-charged incidents involving the boys to their school. Id. at 70. In 1999, when SC was in fifth grade, his parents learned that he and RC had been engaging in oral sex on the school bus. Id. They reported this to Tewksbury Public School administrators and the Massachusetts Department of Social Services. Id. The boys were subsequently placed on different school buses and teachers were instructed to keep them separated and monitor their interactions. Id.

The following year, the only known incident between the boys occurred when RC touched SC on his buttocks. Id. The next year, when SC was a seventh grader, he spent a large part of his day in a self-contained classroom with RC and five other students. Id. During the first few months of the year, school employees were aware of three incidents involving inappropriate touching between the boys. Id. In two incidents RC touched SC's leg in their self-contained classroom, after which the boys were separated. Id. at 70-71. A third incident occurred during gym, when the boys were touching each other while seated in the bleachers. Id. at 71. After that incident a guidance counselor spoke with the boys; he also instructed teachers and aides to monitor the boys closely. Id.

Then, on one occasion, RC was given permission to leave the classroom to go to the bathroom. Id. Several minutes later, but before RC returned, SC was given permission to leave the classroom to get a book. Id. When neither boy returned to the classroom, staff went looking for the boys. Id. They found that the boys had met in a bathroom. Id. SC subsequently disclosed that the boys had engaged in sexual intercourse in the bathroom. Id. Afterwards, SC was removed from school and tutored at home. Id. SC was hospitalized several months later following a suicide attempt. Id.

SC's parents subsequently sued the Town of Tewksbury alleging a violation of Title IX. Following a jury verdict in favor of the plaintiffs, the district court denied the Town of Tewksbury's motion for judgment notwithstanding the verdict. Id. at 72. On appeal, the First Circuit assumed, without deciding, the plaintiffs had established the first four elements of a Title IX claim, but went on to rule Tewksbury was entitled to judgment notwithstanding the verdict because no "rational jury could have concluded that Tewksbury was deliberately indifferent to the harassment of SC" Id. at 73. Specifically, the First Circuit opined "a claim that the school system could or should have done more is insufficient to establish deliberate indifference; in the Title IX context." Id.

The Springfield Defendants argue the facts in this case are less egregious than in Porto and, therefore, the court must conclude that they were not deliberately indifferent to the harassment of BW. They point to the lengthy history of inappropriate sexual contact between SC and RC and the absence of previous suspensions or other, similar, disciplinary action. In this case, the Springfield Defendants note, RJ was suspended after the May 2009 incident and BW and RJ were placed in separate classrooms for the remainder of the 2008-2009 school year. The Springfield defendants were not aware of any additional inappropriate contact between RJ and BW until after the January 2010 incidents. Following the January 2010 incidents, RJ was again suspended and assigned to a different classroom from BW. While acknowledging the steps taken after the May 2009 incident proved insufficient to prevent the January 2010 incident, the Springfield Defendants argue they took sufficient steps, given what they knew at the time about RJ and BW, to preclude a reasonable jury from finding they had been deliberately indifferent in their response to the May 2009 incident.

Plaintiff takes a different view. She asserts the May 2009 incident involved harassment sufficiently severe that the Springfield Defendants had an obligation to take some action to protect BW during the subsequent school year. Instead, the Springfield Defendants did nothing. BW and RJ were placed back in the same class. Plaintiff was not notified of this placement change from the end

11

of the previous year and the teachers responsible for supervising BW and RJ were not informed of the incident in May 2009, much less instructed to closely monitor interactions between BW and RJ. In addition, Plaintiff argues the court should infer that members of the school administration knew, or should have known, BW's seventh grade teacher did not follow generally applicable school supervision policies and often allowed her class to go to gym unaccompanied. Taken together, Plaintiff asserts these facts and favorable inferences provide a sufficient basis from which a reasonable jury could conclude the Springfield Defendants demonstrated deliberate indifference to the risk RJ's harassment posed to BW during their seventh grade year.

When viewed in the light most favorable to Plaintiff, the school's actions demonstrate a complete lack of concern about sexual contacts between BW and RJ during the 2009-2010 school year, distinguishing this case from Porto. In Porto, there was a plan in place to prevent inappropriate contact between SC and RC: teachers responsible for supervising the two students were instructed to keep them separated and to monitor their interactions. Porto, 448 F.3d at 70, 71. This plan, though insufficient, ensured those responsible for supervising SC and RC noticed, and were concerned by, their joint absence from class within several minutes. As a result, the students were quickly found on the only known occasion when they engaged in sexual intercourse at school. Id.

By contrast, the evidence offered by Plaintiff suggests the classroom teacher tasked with supervising BW and RJ received no information about past inappropriate contact between these two students or instructions to separate them or monitor their behavior. Additionally, there is evidence the administration knew, or should have known, the classroom teacher was not even following generally applicable school rules regarding the supervision of students. As a result, despite the history of RJ touching BW in a sexual manner, without her consent, the students missed significant portions of two gym classes in the same week, without raising the suspicions of those teachers responsible for supervising them.

Given the information available to the Springfield Defendants concerning RJ, BW, and the May 2009 incident, it was unreasonable to take no steps during the 2009-2010 school year to prevent RJ from engaging in further nonconsensual sexual contact with BW. Taking no steps is inclusive of the failure to give the teacher any notice or instruction to heighten her awareness of possible issues involving RJ and BW during the 2009-2010 school year. A reasonable jury crediting the evidence before the court could conclude the choices by the Springfield Defendants demonstrated deliberate indifference to RJ's harassment of BW. The court therefore denies Defendants' motion as to the Title IX claims against the Springfield Defendants.

B.      ADA Claim

Plaintiff also claims that Defendants discriminated against BW in violation of Title II of the ADA. "The ADA is a federal civil rights statute designed to provide comprehensive protection for disabled individuals against discrimination based on their disabilities." Theriault v. Flynn, 162 F.3d 46, 47-48 (1st Cir. 1998). Title II provides that no "qualified individual with a disability" shall "be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity" by reason of the person's disability. 42 U.S.C. § 12132. "To state a claim for a violation of Title II, a plaintiff must allege: (1) that he is a qualified individual with a disability; (2) that he was either excluded from participation in or denied the benefits of some public entity's services, programs, or activities or was otherwise discriminated against; and (3) that such exclusion, denial of benefits or discrimination was by reason of his disability." Toledo v. Sanchez, 454 F.3d 24, 31 (1st Cir. 2006).[6] Defendants do not dispute BW was a qualified individual with a disability, the

---

[6] Though the issue of damages is not raised at the summary judgment stage, the court also notes that to recover compensatory damages, a plaintiff must prove that the discrimination suffered was intentional. Nieves-Marquez v. Puerto Rico, 353 F.3d 108, 126 (1st Cir. 2003).

court therefore assumes (without deciding) BW's learning disabilities and other cognitive impairments brought her within the class protected by the ADA. It is undisputed that, following the January 2010 incidents, with the exception of a single day, BW did not attend school. When a student does not attend school, she has clearly suffered the loss of educational opportunities. See Olmstead v. L.C. ex rel. Zimring, 527 U.S. 581 (1999) ("Congress explicitly identified unjustified 'segregation' of persons with disabilities as a 'for[m] of discrimination.'); see also, K.M. ex rel. D.G. v. Hyde Park Cent. School Dist., 381 F. Supp. 2d 343, 361 (S.D.N.Y. 2005) (finding that peer harassment had altered the conditions of a student's school experience where the student felt unable to attend school "for the better part of a year").

Plaintiff advances two different theories as to how BW's loss of educational opportunities was "by reason" of her disability. First, she claims Defendants knew RJ had harassed BW due to her disability and they failed to take appropriate action to keep her safe from the peer-to-peer harassment. Second, she alleges Defendants, themselves, discriminated against BW on account of her disability when they failed to accommodate her disability by adopting adequate safety measures for her, either before or after the January 2010 incidents. The court considers each in turn.

1. Peer-to-Peer Harassment

This first claim, like Plaintiff's Title IX claim is based on Defendants' response to third-party conduct. The First Circuit has not yet addressed whether school district liability exists for peer-to-peer, disability-based harassment, but several circuits have found the standards applicable in Title IX cases also apply in cases alleging peer-to-peer, disability-based harassment. See Stewart v. Waco, 711 F.3d 513 (5th Cir. 2013) (applying Davis by analogy in the context of the § 504 of the Rehabilitation Act and noting §504, Title II of the ADA, Title IX and Title VI all include similar wording); S.S. v. E. Kentucky Univ., 532 F.3d 445, 453 (6th Cir. 2008) ("Davis . . . has been applied to disability-based peer-on-peer harassment claims brought under the ADA and § 504 by the majority of federal

district courts to have addressed the issue."); see also K.M. ex rel. D.G., 381 F. Supp. 2d at 360 ("[A] school district's deliberate indifference to pervasive, severe disability-based harassment that effectively deprived a disabled student of access to the school's resources and opportunities would be actionable under . . . Title II [of the ADA].").

This court is persuaded the Davis analysis is appropriately applied where there has been peer-to-peer harassment based on disability. However, the court is not persuaded this is such a case. The mere fact that a disabled student has been harassed by another student is insufficient to show that the disabled student was targeted because of her disability. Here, the record simply does not contain any facts that show, or from which it can be inferred, that RJ targeted BW for harassment because of her cognitive disabilities. While the nature of BW's cognitive impairments may have increased her susceptibility to RJ's harassment, she has not presented evidence that RJ, who also suffers from cognitive impairments, sought to take advantage of her because of her disability. The ADA does not impose liability for a failure to protect a student from harassment that was not based on a student's disability. The court therefore grants Defendants' motion for summary judgment with respect to the ADA claim based on peer-to-peer harassment.

2. Failure to Accommodate

Plaintiff also claims Defendants discriminated against BW by failing to properly supervise her. This claim differs from the peer-to-peer harassment claim because it involves an affirmative obligation on the part of Defendants, unrelated to specific threats from other students, to provide BW with additional supervision due to her cognitive impairments. Pursuant to the Individuals with Disabilities in Education Act ("IDEA"), 20 U.S.C. §§ 1400-1491, states receiving federal funding under the IDEA must provide all disabled children in their jurisdiction with a free appropriate public education ("FAPE"). D.B. ex rel. Elizabeth B. v. Esposito, 675 F.3d 26, 34 (1st Cir, 2012). "The 'primary vehicle' for delivery of a FAPE is an IEP." Id. Though challenges to the substance or

implementation of an IEP are generally brought pursuant to the IDEA,[7] a claim that insufficiencies in a student's IEP resulted in the denial of FAPE may also be brought pursuant to the ADA, provided there is a "showing that the denial resulted from a disability-based animus." Id.

The court considers this theory separately for the two relevant periods; first, the period ending with the disclosure to Plaintiff of the January 2010 incidents and second, the period beginning after the disclosure and running through the remainder of the 2009-2010 school year. As to the first period, Plaintiff has not alleged a denial of FAPE that is independent of RJ's harassment. Defendants can only be held liable for violations that result from RJ's harassment under the peer-to-peer harassment analysis addressed above, the court therefore grants Defendants' motion for summary judgment as to an ADA claim based on Defendants' alleged failure to accommodate BW's disability during the period that ends with the January 2010 incidents.

Turning to the second period, which began after the January 2010 incidents, Plaintiff argues that Defendants refused to make changes to BW's IEP that were necessary to insure her safety at school. Plaintiff states she became concerned that BW was not safe at school after she learned about the January 2010 incidents. When BW reported seeing RJ in the hallway on the one day that she returned to school, Plaintiff's concerns grew. A few weeks later, Plaintiff attended an IEP meeting for BW where the IEP team discussed adding safety measures to BW's IEP. After the meeting, Plaintiff was still concerned about BW's safety at school. As a result, Plaintiff continued to keep BW home. These facts sufficiently allege a denial of FAPE distinct from any denial of FAPE caused by RJ's conduct. However, in order for a violation of FAPE to also violate the ADA, Plaintiff must show the denial "resulted from a disability-based animus." D.B. ex rel. Elizabeth B., 675 F.3d at 40. Plaintiff has not provided the court with any facts suggesting that Defendants denied Plaintiff's request for changes to BW's IEP because of a disability-based animus. The court therefore grants

---

[7] The IDEA includes significant exhaustion requirements. See Frazier v. Fairhaven School Comm., 276 F.3d 52, 59 (1st Cir. 2002). This court has not considered whether or how they would apply to Plaintiff had she brought an IDEA claim.

Defendants' motion for summary judgment as to the ADA claim based on Defendants' failure to accommodate after the January 2010 incidents.

C.     § 1983 Claims

Section 1983 supplies a private right of action against a person who, acting under color of state law, deprives another of rights secured by the Constitution or by federal law. Evans v. Avery, 100 F.3d 1033, 1036 (1st Cir. 1996). In order to state a claim under § 1983, Plaintiff must allege a violation of a "federally-protected right." Nieves v. McSweeney, 241 F.3d 46 (1st Cir. 2001). Plaintiff asserts her right to bodily integrity and her right to a public education have been violated by the Springfield Defendants and by defendants Ingram, Morris, and Swan, in their individual and official capacities.

1.   Violation of Right to Bodily Integrity

The court understands Plaintiff to allege a violation of BW's a substantive due process right to be free from bodily injury protected by the Fourteenth Amendment. See Youngberg v. Romeo, 457 U.S. 307, 315 (1982); see also, Martinez v. Cui, 608 F.3d 54, 63 (1st Cir. 2010). Plaintiff does not allege this violation was carried out by a state actor, but rather that state actors failed to protect BW against a violation by RJ, a third party. As the Supreme Court has explained, "a State's failure to protect an individual against private violence simply does not constitute a violation of the Due Process Clause." DeShaney v. Winnebago County Dept. of Soc. Servs., 489 U.S. 189, 197 (1989). There are two exceptions to this general rule. In this case, neither applies for the reasons explained below.

The first exception to the general rule, articulated by the Supreme Court in DeShaney, imposes a duty of protection on a state actor, with respect to a particular individual, when the state creates a "special relationship" with the individual by imposing limits on that individual's "freedom

to act on his own behalf." Id. at 200. The type of "special relationship" described by the Supreme

Court in DeShaney arises only when the state has taken custody of a person. DeShaney, 489 U.S. at

199-200; see also, Rivera, 402 F.3d at 36 (describing "special relationship" as existing "when an

individual is incarcerated or is involuntarily committed to the custody of the state"). As BW was not

in the Springfield Defendants' custody and attended school voluntarily, no "special relationship"

existed between BW and the Springfield Defendants. See Doe ex rel. Magee v. Covington County

School Dist. ex. Rel. Keys, 675 F.3d 849 (5th Cir. 2012) (affirming lower court and declining to find

that school had a "special relationship" with a young student because her attendance at school was

voluntary and she was not in the school's custody).

Second, courts in several districts have read DeShaney to also impose a duty to protect

"where the government affirmatively acts to increase the threat to an individual of third-party

harm." Coyne v. Cronin, 386 F.3d 280, 287 (1st Cir. 2004)(citing DeShaney). Theoretically,

government action can increase the threat to an individual and thus become liable for harm done by

a third-party on the theory that the government action "limited [a person's] ability to protect himself

(the 'limitation theory'), or under the theory that [the government] . . . created or substantially

contributed to the danger he faced then failed to protect him from it (the 'state-created danger'

theory)." Rivera v. Rhode Island, 402 F.3d 27, 35 (1st Cir. 2005). Superficially, it may appear this

exception to the general rule, that governments do not have a duty under the Constitution to protect

against harms caused by third-parties, is applicable here. Had the supervision Defendants provided

to BW complied with established policy, it seems unlikely that the January 2010 incidents would

have occurred. However, the First Circuit has concluded, in a case with demonstrably more

egregious conduct by government actors, that the "theory of state-created danger[] cannot be used

as an end run around" the Supreme Court's holding in DeShaney. Rivera, 402 F.3d at 38.

In <u>Rivera</u>, a teenager, Jennifer, who witnessed a murder and agreed to testify received repeated murder threats, over a period of months. <u>Id.</u> at 31-31. She shared these threats with the police, and they assured she would be safe. <u>Id.</u> Despite these threats, Jennifer was not placed in witness protection, even though another teenager who also testified to the grand jury was placed in witness protection following a murder threat related to his testimony. <u>Id.</u> at 32. Just days before Jennifer was scheduled to testify in the trial, she was shot while standing outside her home. <u>Id.</u> Despite involving Jennifer in the murder case by asking her to sign witness statements and testify both to the grand jury and at trial, having knowledge of specific threats against Jennifer, and having options to provide greater protection to her, the First Circuit determined the defendants did not have a Constitutional duty to protect Jennifer. <u>Id.</u> at 38.

Here, taken in the light most favorable to Plaintiffs, the conduct of Defendants can be described as failing to take any action during one school year to prevent the repetition or escalation of behavior that had occurred, and been punished, in a prior school year. Unlike the defendants in <u>Rivera</u>, Defendants in this case received no information about ongoing threats. By the time the January 2010 incidents occurred, months had passed without any reports that should have triggered action to protect BW. Since the conduct attributed to Defendants is considerably less flagrant than the conduct attributed to the defendants in <u>Rivera</u>, the court concludes that as a matter of law, Defendants' conduct was insufficient to constitute a state-created danger capable of imposing upon Defendants a Constitutional duty to protect BW from RJ. In the absence of such a duty, Defendants' action and inaction, regrettable as it was, did not result in a violation of BW's rights under the Due Process Clause of the Fourteenth Amendment. Defendants did not have a duty to protect BW that was triggered under a theory of state-created danger.

2. Violation of Right to Public Education

Plaintiff also asserts that by failing to keep BW safe from RJ, Defendants denied BW a public education. The Constitution does not guarantee a right to a public education. <u>Toledo v. Sanchez</u>, 454 F.3d 24, 33 (1st Cir. 2006) (citing <u>San Antonio Ind. Sch. Dist. V. Rodriguez</u>, 411 U.S. 1, 35 (1973). Under IDEA, Congress has established a statutory right to FAPE, but Plaintiff has not asserted a denial of her right to FAPE.[8] The court therefore concludes that Plaintiff is asserting a violation of her right to be free from discrimination under the Equal Protection Clause. <u>See Fitzgerald v. Barnstable School Comm.</u>, 555 U.S. 246 (2009) (holding that despite the existence of Title IX, "§ 1983 suits based on the Equal Protection Clause remain available to plaintiffs alleging unconstitutional gender discrimination in schools") "In order to prevail on an equal protection claim based upon alleged selective denial of protection, 'plaintiffs must adduce competent evidence of purposeful discrimination.'" <u>Melendez –Garcia v. Sanchez</u>, 629 F.3d 25, 38 (1st Cir. 2010) (quoting <u>Hayden v. Grayson</u>, 134 F.3d 449, 453 (1st Cir. 1998)). The Supreme Court has explained that "[d]iscriminatory purpose . . . implies that the decisionmaker . . . selected or reaffirmed a particular course of action at least in part 'because of,' not merely 'in spite of,' its adverse effects on an identifiable group." <u>Pers. Adm'r of Massachusetts v. Feeney</u>, 442 U.S. 256, 279 (1979). The facts before the court, even construed in the light most favorable to Plaintiff, do not support a claim that any of the defendants acted, or abstained from acting, due to a discriminatory purpose.

In the absence of evidence that Defendants acted with discriminatory animus, the court grants Defendants' motion for summary judgment as to Plaintiff's § 1983 claims.

---

[8] It seems unlikely that Plaintiff could sustain such a claim. The First Circuit has held that "plaintiffs who bring an IDEA-based claim under 42 U.S.C. § 1983, in which they seek only money damages, must exhaust the administrative process available under the IDEA as a condition precedent to entering a state or federal court." <u>Frazier v. Fairhaven Sch. Comm.</u>, 276 F.3d 52, 64 (1st Cir. 2002).

IV.  CONCLUSION

For the Foregoing reasons, Defendants' Motion for Summary Judgment is DENIED as to Plaintiff's Title IX claims against the Springfield Defendants and GRANTED as to Plaintiff's Title IX claims asserted against the individual defendants and her ADA and § 1983 claims.

It is So Ordered.


  /s/ Mark G. Mastroianni

MARK G. MASTROIANNI

United States District Judge